IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATHRYN M. VAN ORDEN, individually and as administratrix ad prosequendum of the Estate of Celena J. Sylvestri, <br><br> Plaintiff, <br><br> v. <br><br> BOROUGH OF WOODSTOWN, et al., <br><br> Defendants. | HONORABLE JEROME B. SIMANDLE <br><br> Civil No. 13-5002 (JBS/AMD) <br><br> **OPINION** |

APPEARANCES:

Thomas W. Sheridan, Esq.
Christopher D. Hinderliter, Esq.
SHERIDAN & MURRAY, LLC
424 S. Bethlehem Pike, Third Floor
Fort Washington, PA 19034
    Attorneys for Plaintiff

Michael M. Mulligan, Esq.
317 Shell Road
P.O. Box 432
Carney's Point, NJ 08069
    Attorney for Defendant Salem County and Salem County
    Sheriff

**SIMANDLE**, Chief Judge:

I.    **INTRODUCTION**

    Plaintiff Kathryn M. Van Orden filed this 42 U.S.C. § 1983

action against various municipality, county, and state officials

after her daughter, Celena J. Sylvestri, drowned in her car on a

flooded road in Salem County, New Jersey, after officials opened

the floodgates of the Veterans Memorial Lake Dam in anticipation of the arrival of Hurricane Irene without closing the affected road.

The state defendants asserted sovereign immunity under the Eleventh Amendment and have already been dismissed from this case. [Docket Item 32.] In an earlier Opinion, the Court also considered the claims against Borough of Woodstown, the Woodstown Police Department, and Pilesgrove Township, and dismissed the state tort actions against them, leaving only the § 1983 claim for state-created danger. [Docket Item 44.]

Now pending before the Court are two motions to dismiss and for summary judgment filed by the remaining Defendants in this case, Salem County and the Salem County Sheriff ("the Salem County Defendants"). In addition to seeking summary judgment on the § 1983 claim and state tort claims, Defendants argue that they are entitled to sovereign immunity under the Eleventh Amendment.

For the reasons set forth below, the Court finds that state sovereign immunity does not apply to the Salem County Defendants, and will deny summary judgment on the § 1983 claim for state-created danger because discovery is not yet complete. Because Plaintiff does not oppose dismissal of the state law claims, and because Plaintiff failed to comply with the notice

2

requirements of the New Jersey Tort Claims Act, the Court will
dismiss those claims.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. Factual Background[2]

---

[1] The Court exercises subject matter jurisdiction over
Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and
exercises supplemental jurisdiction over Plaintiff's state law
claims pursuant to 28 U.S.C. § 1367.

[2] Defendants filed a "Statement of Facts" in connection with
their two motions and Plaintiff submitted a "Counterstatement of
Facts," but neither party has complied with the requirements of
L. Civ. R. 56. 1. Defendants' Statement of Facts contains
citations to documents not contained in the summary judgment
record submitted to the Court, and the Court will therefore
disregard the facts that are unsupported. (Def. Mot. to Dismiss
and for Summ. J. [Docket Item 73] at 5-17; Def. Second Mot. for
Summ. J. [Docket Item 90-1] at 4-16); Loc. Civ. R. 56.1(a)
("[T]he movant shall furnish a statement which sets forth
material facts as to which there does not exist a genuine issue,
. . . citing to the affidavits and other documents submitted in
support of the motion."); see also Johnson v. NovaStar Mort.,
Inc., Civ. No. 09-1799, 2011 WL 4549143, at *1 n.1 (D.N.J. Sept.
29, 2011) (Simandle, J.) (declining to consider unsupported
allegations in plaintiff's responsive statement of material
facts which cited to evidence that was not included in documents
submitted to the court).

Although Plaintiff acknowledges that the Defendants' § 1983
and state tort arguments should be reviewed under the summary
judgment standard, she did not file a responsive 56.1 statement
to address Defendants' Statement of Facts in accordance with L.
Civ. R. 56.1(a), which provides: "The opponent of summary
judgment shall furnish, with its opposition papers, a responsive
statement of material facts, addressing each paragraph of the
movant's statement, indicating agreement or disagreement and, if
not agreed, stating each material fact in dispute and citing to
the affidavits and other documents submitted in connection with
the motion." Additionally, her "Counterstatement of Facts"
merely recites the allegations in the Complaint, and contains
only citations to the Complaint. (See Pl. Resp. to Mot. to
Dismiss and for Summ. J. [Docket Item 81] at 2-3; Pl. Resp. to

The Veterans Memorial Lake Dam is located in the Borough of Woodstown in Salem County, New Jersey, and is owned by the Borough of Woodstown. On Saturday, August 27, 2011, on the eve of Hurricane Irene, the floodgates to the Veterans Memorial Lake Dam ("the Dam") were fully opened in order to take pressure off the dam. (Statement of Material Facts ("SMF") [Docket Item 73] ¶ 19; Pompper Cert. [Docket Item 72-1] ¶ 22.) As a result, Salem River water levels rose and flooded a section of Route 40 in Salem County. (SMF ¶ 4.)

At the time, a statewide emergency was in place due to the impending hurricane. The emergency order, which was issued under Executive Order No. 73, authorized the State Director of

───────────────

Second Summ. J. Mot. [Docket Item 101] at 1-3.) Because Plaintiff has not complied with L. Civ. R. 56.1, the Court deems the facts in Defendants' Statement of Facts *that are in compliance with Rule 56.1* undisputed for purposes of the instant motions. L. Civ. R. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.").

Plaintiff has, however, submitted the deposition transcripts of Harry Vanaman and Richard Pfeffer, as well as a copy of the Emergency Action Plan for Veteran Memorial Lake Dam, in connection with her brief in opposition to Defendants' second motion. Because these documents are highly relevant to this case and are referenced in the body of Plaintiff's brief, the Court, exercising its discretion and in order to base its decision on a more complete picture of the record, will supplement the record provided by Defendants with the documents appended to Plaintiff's brief.

Both parties are admonished to adhere to the requirements of the Local Civil Rules in future filings before the Court.

Emergency Management, "through the police agencies under his control, to determine the control and direction of the flow of vehicular traffic on any State or interstate highway . . . including the right to detour, reroute, or divert any or all traffic . . . ." See N.J. Exec. Ord. No. 73 (Aug. 25, 2011), ¶ 2.

Due to the flooding, at around 9:43 p.m., the Woodstown Barracks of the New Jersey State Police told Salem County that they would close the affected section of Route 40. (SMF ¶ 29, Pompper Cert. ¶ 27.) Shortly thereafter, at around 10:00 p.m., Salem County issued a county-wide travel ban. (SMF ¶ 23; Popmpper Cert. ¶ 25.)

Later that same evening, Celena Sylvestri left her apartment in her car. (SMF ¶ 26.) She had been speaking with a friend, Mario Oliveto, earlier that evening, and Oliveto had spoken about the state of emergency and told Sylvestri to stay put in her apartment and not leave. (Oliveto Dep. [Docket Item 77] 28:18-29:6.) Sylvestri left home between approximately 11 p.m. and 1 a.m. and drove onto Route 40.

In an emergency, New Jersey law authorizes the Governor "[t]o assume control of all emergency management operations." N.J.S.A. App. A:9:51(a)(1). In addition to authorizing state police to control and direct the flow of traffic, Executive

Order No. 73 authorized the State Director of Emergency
Management to activate the State Emergency Operations Plan, to
"direct the activation of county and municipal emergency
operations plans as necessary," and to "coordinate the
preparation, response and recovery efforts from this emergency
with all governmental agencies . . . ." Id. ¶ 1.

Pompper certified that the South Regional Unit of the New
Jersey Office of Emergency Management ("New Jersey OEM") "has
jurisdiction over Salem County" and Salem County's Office of
Emergency Management ("Salem County OEM"). (Pompper Cert. ¶ 11-
12.)[3]

---

[3] In their Statement of Facts, Defendants also asserted that the
Salem County OEM receives emergency management agency assistance
("EMAA") funds from the state of New Jersey and in return,
"cedes the direct command and control function to NJOEM in
consideration of taking EMAA grant money." Defendants provide a
block quote from the Pompper Certification in support of this
assertion. The quote, however, merely states that jurisdictions
that receive an EMAA grant must comply with an EMAA "work plan,"
and that emergency management regional personnel must "meet with
and evaluate EMAA-funded jurisdictions for year-end reports,
development and review of Emergency Operation Plans (EOPs),
exercises, and performance review of semi-annual and final claim
forms." (Pompper Cert. ¶ 12.) It does not support Defendants'
bald statement that Salem County, in receiving an EMAA grant,
transferred control of their emergency management office to the
state. Moreover, Pompper in turn appears to have taken the
statement directly from the New Jersey State Police Emergency
Management Section website. (Pompper Cert. ¶ 10-12 (citing to
New Jersey State Police website)). Because it does not appear
that Pompper had "personal knowledge" of this statement, and
because Defendants' assertion is unsupported by its source, the
Court will disregard it. See Loc. Civ. R. 7.2(a) (affidavits and

6

The Veterans Memorial Lake Dam's Emergency Action Plan was in place at the time of the tragic incident. The Dam's Emergency Action Plan delineated different roles and responsibilities for the municipal, county, and state offices of emergency management ("OEMs"):

> Municipal OEM Responsibilities:
> 1. Warn the public of emergency conditions at the dam.
> 2. Implement and direct required evacuations of threatened areas.
> . . .
>
> County OEM Responsibilities:
> 1. Pass warning of emergency conditions at the dam to all affected municipalities.
> 2. Provide assistance to municipalities to help fulfill the emergency responsibilities.
>
> NJ-OEM Responsibilities:
> 1. Assumption of control and coordination (when appropriate) of all emergency actions in accordance with Public Law.
> 2. Provision of assistance to the affected municipalities and counties (when requested and beyond their capabilities).
> 3. Coordination of specialized assistance.
> . . . .

(Dam Emergency Action Plan, App'x B to Pl. Resp. to Second Mot. for Summ. J. [Docket Item 101-1], at 10-11.) Jeffrey Pompper was the Emergency Management Coordinator for Salem County ("Salem County EMC"), and Harry Vanaman was the Emergency Management Coordinator for Woodstown ("Woodstown EMC"). Woodstown and Salem

---

certifications "shall be restricted to statement of fact within the personal knowledge of the signatory.")

County had a joint responsibility to operate the Dam, and under the Emergency Action Plan, Salem County was required to help Woodstown make decisions. (Vanaman Dep., App'x A to Pl. Resp. to Second Mot. for Summ. J. [Docket Item 101-1], at 96:22-97:21; 122:19-23; Pfeffer Dep., id., App'x C [Docket Item 101-1], at 66:21-67:7.) Vanaman testified that he specifically relied on Pompper to fulfill Salem County's responsibility to help operate the Dam. (Id. at 98:21-99:5.)

Pompper stated in a certification that Vanaman opened the dam's floodgates and notified him of the opening, but Vanaman testified that the decision to fully open the floodgates of the Dam on August 27th was made jointly by Vanaman, Pompper, and the Woodstown Mayor. (Id. 239:12-22.) At some point that same day, Vanaman learned that the Dam became overtopped and water was going over Mill Street Road, triggering a dam emergency condition. (Id. at 214:9-215:21; 217:12-17.) Vanaman testified that pursuant to the Emergency Action Plan, they blocked off the affected area of Mill Street and notified the New Jersey State Police of the Dam's conditions.

According to Vanaman, the New Jersey State Police made the decision to close Route 40 and Vanaman did not learn of the closure until he received a "fire call" about a car being in the waterway. (Id. at 195:8-18; 197:5-17; 224:21-225:5.) State

police had blocked traffic west of the flooded portion of the
road but had not blocked traffic east of it. (SMF ¶ 30.)
Sylvestri drove onto the flooded road and drowned before
emergency workers could reach her.

**B. Procedural History**

Sylvestri's mother, Kathryn M. Van Orden, as administratrix
of Sylvestri's estate, filed suit in this Court under 42 U.S.C.
§ 1983, naming as Defendants various state, county, and
municipal entities. In addition to a claim of state-created
danger under § 1983 (Count III), Plaintiff brings state tort
claims, asserting negligence (Count I), vicarious liability
(Count II), strict liability (Count IV), wrongful death (Count
V), and a survival action (Count VI). (Compl. [Docket Item 1] ¶¶
62-100.)

The State of New Jersey, the New Jersey State Police, and
the New Jersey Department of Environmental Protection Bureau of
Dam Safety and Flood Control have already been dismissed from
the case. [Docket Item 32.] The Court has also dismissed the
state tort claims against the Borough of Woodstown, Woodstown
Police Department, and Pilesgrove Township, because Plaintiff
failed to comply with the notice requirements of the New Jersey
Tort Claims Act, leaving only the § 1983 state-created danger
claim against those Defendants. [Docket Item 44.]

The Court now considers two motions filed by Salem County
and the Salem County Sheriff. The first, a motion to dismiss
under Fed. R. Civ. P. 12(b)(1) and in the alternative for
summary judgment under Rule 56, argues that the Salem County
Defendants are immune from suit under the Eleventh Amendment,
and that no reasonable jury could find that Defendants violated
Sylvestri's constitutional rights under a theory of state-
created danger. [Docket Item 72]. The second motion seeks
dismissal of the state tort claims on various grounds. [Docket
Item 90.]

Because Plaintiff has stipulated to the dismissal of the
state law claims (Pl. Resp. to Second Mot. for Summ. J. [Docket
Item 101], at 8), the Court will grant Defendants' second motion
for summary judgment.

With respect to Defendant's first motion, the Court must
decide two issues: first, whether the Salem County Defendants
are entitled to immunity under the Eleventh Amendment, and if
not, whether the § 1983 claim must nonetheless be dismissed
because no reasonable jury could find on the record that their
actions on August 27th shocked the conscience.

## III. STANDARD OF REVIEW

Defendants styled their first motion as a motion to dismiss
under Fed. R. Civ. P. 12(b)(1) for lack of subject matter

jurisdiction and in the alternative for summary judgment under
Fed. R. Civ. P. 56. Where, as here, a movant frames a motion to
dismiss in the alternative as one for summary judgment, the
Court may convert the motion without notice, because the motion
itself puts the non-moving party on sufficient notice that the
Court might treat the motion as one for summary judgment. See,
e.g., S. Jersey Gas Co. v. Mueller Co., Ltd., No. 09-4194, 2010
WL 1742542, *4 (D.N.J. Apr. 27, 2010) (citing Hilfirty v.
Shipman, 91 F.3d 573, 578-79 (3d Cir. 1996); Carver v. Plyer,
115 Fed. App'x. 532, 536 (3d Cir. 2004)).

In her opposition to the pending motion, Plaintiff
addressed the Eleventh Amendment immunity argument under the
12(b)(1) standard and the § 1983 claim under the summary
judgment standard, and included a "Counterstatement of Facts,"
thereby confirming her knowledge that the Court may treat
Defendant's motion to dismiss the § 1983 claim as one for
summary judgment. (See, e.g., Pl. Resp. to Mot. to Dismiss and
for Summ. J. at 2-3, 12-13.) The Court will therefore review
Defendants' Eleventh Amendment argument under Rule 12(b)(1), and
will treat Defendants' motion to dismiss Count III as one for
summary judgment.

## A. Motion to Dismiss under Fed. R. Civ. P. 12(b)(1)

A motion to dismiss on the grounds of state sovereign

immunity is properly brought pursuant to Rule 12(b)(1) because
the Eleventh Amendment "is a jurisdictional bar which deprives
federal courts of subject matter jurisdiction." Blanciak v.
Allegheny Ludlum Corp., 77 F.3d 690, 693, n.2 (3d Cir. 1996);
see also Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73
(2000). In deciding a motion under Rule 12(b)(1), a court must
first determine whether the movant presents a facial or factual
attack, because that distinction determines how the pleading is
reviewed. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549
F.2d 884, 891 (3d Cir. 1977). A facial challenge contests the
sufficiency of the complaint because of an alleged pleading
deficiency, while a factual attack challenges the actual failure
of the plaintiff's claims to comport with jurisdictional
prerequisites. See id.; United States ex rel. Atkinson v. PA.
Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007).

A party makes a facial challenge to jurisdiction when she
files a Rule 12(b)(1) motion prior to any answer, because it
ordinarily calls for assessment of the pleadings only. See
Constitution Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir.
2014) (facial attack occurs before the moving party has filed an
answer or otherwise contested the factual allegations of the
complaint). By contrast, Defendants in this case filed the
instant motion long after their Answer [Docket Item 19], and

12

have based their motion to dismiss on a developed factual record and a sworn certification. Plaintiff, in her opposition, has also introduced additional facts supporting jurisdiction. The Court therefore properly construes Defendants' 12(b)(1) motion as a factual attack. See Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc., 673 F.2d 700, 711 (3d Cir. 1982) ("[Defendant's] motion was supported by a sworn statement of facts. It therefore must be construed as a factual, rather than a facial attack on the court's subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).")

In reviewing a factual challenge to subject matter jurisdiction, the court is free to consider and weigh evidence outside the pleadings, and "'no presumptive truthfulness attaches to plaintiff's allegations.'" Petruska v. Gannon Univ., 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting Mortensen, 549 F.2d at 891); see also Atkinson, 473 F.3d at 514 ("If this is a factual attack . . . it is permissible for a court to review evidence outside the pleadings."). The plaintiff ordinarily has the burden of establishing jurisdiction. But because immunity under the Eleventh Amendment is treated as an affirmative defense, it "does not implicate federal subject matter jurisdiction in the ordinary sense," and "the party asserting Eleventh Amendment immunity (and standing to benefit from its

13

acceptance) bears the burden of proving its applicability."
Christy v. Pennsylvania Turnpike Comm'n, 54 F.3d 1140, 1144 (3d
Cir. 1995).

### B. Summary Judgment under Fed. R. Civ. P. 56

In reviewing a motion for summary judgment under Fed. R.
Civ. P. 56(a), the court is required to examine the evidence in
light most favorable to the non-moving party, and resolve all
reasonable inferences in that party's favor. Hunt v. Cromartie,
526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184
(3d Cir. 2007). If a factual dispute exists as to any material
fact such that a reasonable jury could return a verdict for the
non-moving party, summary judgment must be denied. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986); Celotex
Corp. v. Catrett, 477 U.S. 317, 323 (1986); Boyle v. Cnty. of
Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

### IV. DISCUSSION

### A. The Salem County Defendants are Not Entitled to Immunity under the Eleventh Amendment

The Eleventh Amendment of the Constitution is rooted in the
recognition that the States, "although a union, maintain certain
attributes of sovereignty, including sovereign immunity,"
Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996) (internal
quotations and citation omitted), and provides:

The Judicial power of the United States shall not be

14

> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United States
> by Citizens of another State, or by Citizens or Subjects
> of any Foreign State."

U.S. Const. amend. XI. Under the Eleventh Amendment, an

unconsenting state is immune from suit in federal court by

citizens of that state or citizens of another state. See id.;

Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304

(1990); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89,

100 (1984).

Sovereign immunity also extends to state agents and state

instrumentalities, "'as long as the state is the real party in

interest.'" Estate of Lagano v. Bergen Cnty. Prosecutor's

Office, 769 F.3d 850, 857 (3d Cir. 2014) (quoting Fitchik v.

N.J. Transit Rail Operations, 873 F.2d 655, 659 (3d Cir. 1989)).

The Supreme Court has long emphasized that "'when the action is

in essence one for the recovery of money from the state, the

state is the real, substantial party in interest and is entitled

to invoke its sovereign immunity from suit even though

individual officials are nominal defendants.'" Regents of the

Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997) (quoting Ford

Motor Co. v. Dep't of Treasury of Ind., 323 U.S. 459, 464

(1945)).

Plaintiff argues that the Salem County Defendants are not

entitled to Eleventh Amendment immunity, because there is no

15

evidence that the State of New Jersey will be obligated to indemnify Salem County for any judgment against the County Defendants. (Pl. Resp. to Mot. to Dismiss and for Summ. J. at 7-10.) She also argues that Salem County enjoys significant autonomy from the state, and points out that New Jersey law explicitly permits counties to "sue and be sued." (Id. at 11-12.)

Plaintiff is, of course, correct that counties traditionally do not enjoy state sovereign immunity. "'The Supreme Court has long held that counties, municipalities, and political subdivisions of a state are not protected by the Eleventh Amendment.'" Betts v. New Castle Youth Development Ctr., 621 F.3d 249, 254 (3d Cir. 2010) (quoting Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006)); see also Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'" (citation omitted)).

But the analysis does not end there. Although Plaintiff sues Salem County, her theory of liability turns on Salem County's decision to open the floodgates of the Dam immediately

before the storm. That decision was made solely to the Salem
County Office of Emergency Management, and specifically, by the
Emergency Management Coordinator, Jeffrey Pompper. Indeed,
quoting extensively from Vanaman's deposition testimony,
Plaintiff herself states that "Mr. Vanaman relied upon Jeff
Pompper of Salem County when he operated the dam" and that "Mr.
Pompper was involved in the decision to partially open the
floodgates." (Pl. Resp. to Second Mot. for Summ. J. at 5-6.)
There is no evidence in the record – and Plaintiff does not
argue – that county officials outside of the Salem County OEM
were responsible for the decision. Thus, the more precise
question that must be answered is whether the Salem County OEM
and the Salem County EMC are immune from suit.

Focusing on the relationship between the Salem County OEM
and the New Jersey OEM, the Salem County Defendants argue that
they were controlled by the New Jersey OEM and should therefore
be treated as an arm of the state. Defendants argue that under
New Jersey Executive Order No. 73, the New Jersey OEM directed
the actions of county and municipality OEMs during Hurricane
Irene. (Def. Mot. to Dismiss and for Summ. J. at 26-27.)
Defendants also point to a New Jersey statute mandating the
appointment of a county emergency management coordinator
("EMC"), which states that a county EMC is subject to the orders

17

of the State Director of Emergency Management and may be removed
by the State Director for cause. (Id. at 25.) They argue that
because a county OEM merely carries out the orders of the New
Jersey OEM, it is analogous to a county prosecutor's office,
which is considered an arm of the state because it acts at the
direction of the State Attorney General. (Id. at 24-26 (citing
Wright v. State, 778 A.2d 443 (N.J. 2001).)

To determine whether a state instrumentality should be
treated as an arm of the state and be entitled to immunity under
the Eleventh Amendment, courts generally examine the nature of
the entity and the relationship between the state and the entity
being sued. Regents of the Univ. of Cal., 519 U.S. at 429-30. In
this circuit, courts consider three factors: "(1) whether the
money to pay for the judgment would come from the state; (2) the
status of the agency under state law; and (3) what degree of
autonomy the agency has." Estate of Lagano, 769 F.3d at 857
(citing Fitchik, 873 F.2d at 659); see also Christy v.
Pennsylvania Turnpike Comm'n, 54 F.3d 1140, 1144-45 (3d Cir.
1995). Although the Third Circuit previously considered the
first factor to be the most significant, each element is now
weighed equally when determining whether an entity is entitled
to Eleventh Amendment immunity. Bowers v. Nat'l Collegiate
Athletic Ass'n, 475 F.3d 524, 549 (3d Cir. 2007); Febres v.

18

Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006) ("We now
accord equal consideration to all three prongs of the
analysis."). The Court examines each factor in turn.

1. Payment from the state treasury

State sovereign immunity has traditionally been animated by
the desire to protect state treasuries and minimize federal
courts' involvement in the disbursal of the state fisc. See
Dugan v. Rank, 372 U.S. 609, 620 (1963) (recognizing that "a
suit is against the sovereign if the judgment sought would
expend itself on the public treasury or domain'" (citation
omitted)). If a state is responsible for satisfying judgments
against an institution from public coffers, the factor weighs
strongly in favor of granting Eleventh Amendment immunity. Quern
v. Jordan, 440 U.S. 332, 337 (1979); Edelmen v. Jordan, 415 U.S.
651, 663 (1974). The Third Circuit has emphasized that the state
must have a _legal obligation_ to pay: "[I]f a State is not under
a legal obligation to satisfy a judgment, then any increase in
expenditures in the face of an adverse judgment is considered a
voluntary or discretionary subsidy not entitled to Eleventh
Amendment protections." Bowers, 475 F.3d at 547; see also Febres
v. Camden Bd. of Educ., 445 F.3d 227, 234 (3d Cir. 2006) (noting
that a "state's legal liability (or lack thereof) for an
entity's debts" is "the key factor in our assessment of the

19

state treasury prong.").

It is unclear whether New Jersey or Salem County would stand behind a judgment debt of the Salem County OEM or EMC if they were found liable. Defendants have not pointed to the existence of any statute which requires the state to indemnify county OEMs, nor do they even argue that the state is obligated to assume responsibility for the actions of county OEMs. Moreover, although New Jersey provides for the defense or indemnification of employees of the state, see N.J.S.A. 59:10A-1 et seq., Defendants have not pointed to any evidence showing that county EMCs like Pompper would be considered a state employee. Additionally, the Court has found no statute that requires the state to be financially liable for county OEMs, nor any case law which would indicate, one way or the other, how judgments against county OEMs or EMCs are paid.[4] In the absence of evidence that county OEMs are indemnified by the state, this factor tilts the scale against granting immunity.

---

[4] Plaintiff's argument that Salem County's yearly budget has in the past included money to satisfy judgments against it is unpersuasive. (See Pl. Resp. to Mot. to Dismiss and for Summ. J. at 3-4.) Although Plaintiff cites to Salem County Budget sheets from 2008 through 2014, the budget sheets were not included in any of Plaintiff's submissions and were not properly before the Court. Moreover, the mere fact that Salem County has paid money out of its county budget "to satisfy judgments" reveals nothing about whether it has paid money to satisfy judgments against the Salem County OEM or EMC.

2. <u>Status under state law</u>

The second factor examines whether the state itself considers the entity an arm of the state. <u>Bowers</u>, 475 F.3d at 548. Here, courts look to several factors: how state law treats the entity generally; whether the entity may be sued in its own right; whether the entity is separately incorporated; and whether it is immune from state taxation. <u>Febres</u>, 445 F.3d at 230.

There is little evidence before the Court regarding Salem County OEM's status under state law, and Defendants have not addressed this factor in any meaningful way. Citing to N.J.S.A. App.A:9-42.1, they argue only that the appointment of a county emergency management coordinator must be approved by the State Director of Emergency Management, and that a county EMC is subject to the orders of the State Director. (Def. Mot. to Dismiss and for Summ. J. at 25.) Although this provision indicates that the State Director provides some level of oversight over a county EMC, it does not conclusively demonstrate that New Jersey treats the county OEM or EMC as an arm of the state's emergency management office. The Court finds this factor inconclusive.

3. <u>Autonomy</u>

Defendants point primarily to the New Jersey statute, noted

21

above, which provides that the county EMC is subject to the orders of the State Director of Emergency Management:

> In every county of this State the governing body shall appoint a county emergency management coordinator, which appointment shall be for a term of three years. The appointments shall be subject to the approval of the State Director of Emergency Management and thereafter shall be subject to his orders. The State Director of Emergency Management shall exercise supervision and control of all such appointees, who may be removed by said State Director of Emergency Management for cause.

N.J.S.A. App.A:9-42.1.

Relying on Wright v. New Jersey, 778 A.2d 443 (N.J. 2001), Defendants analogize county EMCs to county prosecutors, who are employed by the county but nonetheless subject to immunity under the Eleventh Amendment because they carry out the duties and functions of the State Attorney General. Defendants argue that like the county prosecutors in Wright, county EMCs are closely supervised and controlled by the State Director of Emergency Management. There are, however, several notable differences in the relationship of a county EMC with the State Director of Emergency Management and a county prosecutor with the State Attorney General.

In Wright, the New Jersey Supreme Court cited to a multitude of state statutes which together demonstrated that county prosecutors were empowered to act only as agents of the Attorney General. 778 A.2d at 452-64 (citing N.J.S.A. 2A:158-4,

22

52:17B-98, 52:17-B-103, 52:17B-106, 52:17B-107a.) The role of
the county EMC is delineated only in N.J.S.A. App. A:9-42.1 –
42.2, and the Court has found no state statute discussing the
role of county offices of emergency management. That there is
little in New Jersey statutes prescribing the role of county
OEMs and EMCs suggests that their function is left more or less
to the counties themselves, and they do not serve as an arm of
the State office.

Moreover, unlike county prosecutors, who are nominated and
appointed by the Governor with advice and consent of the Senate,
a county EMC is appointed by the county itself. See M.J.S.A.
App. A:9-42.1. While the State Director must approve an
appointment and may remove a county EMC for cause, the fact that
the EMC is a county appointee weighs slightly against a finding
of immunity. See Lake Country Estates, Inc. v. Tahoe Reg'l
Planning Agency, 440 U.S. 391, 401-02 (1979) (fact that six of
ten governing members of the Tahoe Regional Planning Agency were
appointed by counties and cities suggested that Agency was meant
to be a separate legal entity from states); Christy v.
Pennsylvania Turnpike Comm'n, 54 F.3d 1140, 1149 (3d Cir. 1995)
(noting that "State authority over the appointment of Commission
members lends obvious support to a finding of sovereignty.").

Although N.J.S.A. App. A:9-42.1 provides that the State

Director "shall exercise supervision and control" over county EMC appointees, a county EMC, unlike a county prosecutor, appears to exercise much more independence than a county prosecutor in carrying out its functions. For example, New Jersey law explicitly authorizes the Attorney General to participate and intervene in any county investigations and proceedings, to initiate proceedings, and to supersede a county prosecutor in any investigation or proceeding "to ensure the proper and efficient handling of the county prosecutors' criminal business." Wright, 778 A.2d at 452-53. Although county EMCs are required to cooperate with the Governor and State Director of Emergency Management and may not adopt any rule or regulation "that may be at variance" with the Governor's orders during an emergency, see N.J.S.A. App.A:9-40, New Jersey statutes do not explicitly allow the State Director to override or intervene in county EMC decisions.

Additionally, the county prosecutor's function is to carry out the goals of the Attorney General's office, which is to "maintain[] . . . an effective statewide law enforcement policy" and obtain uniform enforcement of criminal laws throughout the state Coleman v. Kaye, 87 F.3d 1491, 1501 (3d Cir. 1996) (abrogated on other grounds by Nance v. City of Newark, 501 Fed. App'x 123 (3d Cir. 2012)). The Attorney General "has the

24

ultimate responsibility in matters related to the enforcement of the State's criminal laws that have been legislatively delegated to county prosecutors." Wright, 778 A.2d at 464. In other words, the county prosecutors' primary role is to enforce state law on behalf of the Attorney General.

Critically, and unlike county prosecutors, the role of the county EMCs is not to assist the State Director in implementing the statewide Emergency Operations Plan, which is provided for by N.J.S.A. App.A:9-43.1. Rather, New Jersey law directs county EMCs to be "responsible for the development, coordination, and activation" of their own county-specific emergency operations plans, and to be responsible for activating county emergency services. N.J.S.A. App. A:9-42.2. Although a county's emergency operations plan must first be approved by the state office, each county is responsible for preparing and implementing its own plan. N.J.S.A. App.A:9-43.2, 43.4. New Jersey law requires that county emergency plans be coordinated with the state plan "to ensure a regional coordinated response and the efficient use of resources," see N.J.S.A. App.A:9-43.2, and provides basic guidelines for what county emergency plans must address, see N.J.S.A. App.A:9-43.3, but the specifics of the plan are left up to each individual county.

The Court finds these differences dispositive. Because the

county EMC creates emergency action plans tailored to the county
and is primarily responsible for carrying out county-specific
actions rather implementing state actions, the Court finds that,
despite being subject to some state oversight, county EMCs
function more or less autonomously and are not as an arm of the
State Director of Emergency Management. This factor weighs
against a finding of immunity.

***

Having considered each of the three factors above, the
Court finds that on balance, Defendants have not carried their
burden of demonstrating that the Salem County Office of
Emergency Management and its Emergency Management Coordinator
function as an arm of the New Jersey Office of Emergency
Management. Consequently, and because it is well-settled that
counties are not entitled to assert Eleventh Amendment immunity,
the Salem County Defendants are subject to suit in federal
court.[5]

---

[5] Although Defendants are not entitled to Eleventh Amendment
immunity, New Jersey law limits the liability of state and local
governments during a declared emergency. N.J.S.A. App.A:9-52
provides that when the state, its political subdivisions, and
the "agents, officers, employees, servants, or representatives
of the State or any political subdivision thereof" act in good
faith to carry out orders or rules promulgated during an
emergency, or "perform[] any authorized service in connection
therewith," they are not "liable for any injury or death to
persons or damage to property as the result of any such

**B. The Court will Deny Summary Judgment on the 42 U.S.C. § 1983 Claim (Count III) Because Discovery is not yet Complete.**

Defendants have also moved for summary judgment on Plaintiff's state-created danger claim under 42 U.S.C. § 1983. Plaintiff argues that she has not had an opportunity to fully brief this issue because, at the time of her response, discovery was not yet complete. (Pl. Resp. to Mot. to Dismiss and for Summ. J. at 13-14; Pl. Resp. to Sec Mot. for Summ. J. at 3, 7-8.) She states that while numerous depositions of witnesses from Woodstown have been completed, at least four depositions remained, including key witnesses for Salem County. Plaintiff notes in particular that deposition of the designee for Salem County had not yet been completed. (Pl. Resp. to Mot. to Dismiss and for Summ. J. at 13.)

---

activity." N.J.S.A. App.A:9-52.

    Defendants point to this statute to support their case for Eleventh Amendment immunity. (Def. Mot. to Dismiss and for Summ. J. at 22 (arguing only that N.J.S.A. App.A:9-52 "further proves Eleventh Amendment immunity ought to apply as it does for county prosecutor's offices")). The fact that New Jersey law provides immunity for all state and local government officials and entities during a declared emergency adds some slight weight in favor of finding that local government entities, during an emergency, are considered an arm of the state, but it is not sufficient to overcome the other factors that are specific to the county OEM which weigh against immunity, as discussed above. The Court does not find the existence of this statute sufficiently persuasive to tip the scale in favor of a finding of Eleventh Amendment immunity.

Given these assertions, to which Defendants have not responded, the Court agrees that a ruling on this claim would be premature, and Plaintiff should be given an opportunity to conduct further discovery of the material facts before the Court considers a request for summary judgment against her. Further development of the factual record would be beneficial to both parties, particularly because Plaintiff has represented that the remaining depositions would assist in clarifying the liability of the Salem County Defendants.

Consequently, the Court will deny summary judgment on Count III without prejudice to Defendants' right to re-file once discovery is complete. See Lee v. Sunrise Sr. Living, Inc., 455 Fed. App'x 199, 202 (3d Cir. 2011) (affirming district court's denial of motion for summary judgment because discovery had not yet been completed); Miller v. Beneficial Management Corp., 977 F.2d 834, 846 (3d Cir. 1992) (reversing grant of summary judgment as premature where several depositions remained to be taken); Costlow v. United States, 552 F.2d 560, 564 (3d Cir. 1977) (holding that a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course); Otero v. Cnty. of Monmouth, 2007 WL 2363821, at *1 (D.N.J. Aug. 16, 2007) (denying summary judgment without prejudice because discovery was not yet complete).

## IV. CONCLUSION

Because Plaintiff no longer seeks to pursue her state law claims against Defendants, the Court will grant Defendants' second motion for summary judgment [Docket Item 90] and will dismiss the state law claims.

The Court will deny the Salem County Defendants' first motion to dismiss and for summary judgment [Docket Item 72], and the denial will be without prejudice with respect to the Plaintiff's 42 U.S.C. § 1983 claim of state-created danger (Count III). Defendants may move again for summary judgment on this Count after the close of discovery by submitting a brief by the deadline for filing dispositive motions set by the Amended Scheduling Order of November 30, 2015 [Docket Item 106]. Opposition to the motion shall be served in a timely fashion. The Court may, at its discretion, disregard submissions that do not conform to the requirements of L. Civ. R. 56.1(a).

The accompanying Order will be entered.

**December 10, 2015**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge

29