IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATHRYN M. VAN ORDEN,INDIVIDUALLY AND AS ADMINISTRATIX AD PROSEQUENDUM OF THE ESTATE OF CELENA J. SYLVESTRI; | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 13-5002 (JBS/AMD) |
| v. | **OPINION** |
| BOROUGH OF WOODSTOWN, NJ; SALEM COUNTY, NJ; | |
| Defendant. | |

APPEARANCES:

Thomas W. Sheridan
Chrisopher D. Hinderliter
Sʜᴇʀɪᴅᴀɴ & Mᴜʀʀᴀʏ, LLC
424 S. Bethlehem Pike
Third Floor
Fort Washington, PA 19034
     Attorneys for the Plaintiff

A. Michael Barker
Vanessa Elaine James
Bᴀʀᴋᴇʀ, Gᴇʟꜰᴀɴᴅ & ᴊᴀᴍᴇꜱ
210 New Road
Suite 12
Linwood, NJ 08221
     Attorneys for Defendant Borough of Woodstown, NJ and
     Woodstown Police Department

Michael Morris Mulligan
317 Shell Road
P.O. BOX 432
Carney's Point, NJ 08069
     Attorney for Defendants Salem County, NJ and
     Salem County Sheriff

**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

Plaintiff Kathryn Van Orden ("Plaintiff") filed this suit individually and as administratix of the estate of her daughter, Celena J. Sylvestri, who drowned in her car after officials opened the floodgates of the Veterans Memorial Lake Dam in Salem County in anticipation of the arrival of Hurricane Irene in August 2011. Plaintiff brought this action against various municipal, county, and state officials alleging various state-law tort claims and a state-created danger claim under 42 U.S.C. § 1983.

The state defendants asserted sovereign immunity under the Eleventh Amendment and have already been dismissed from this case. [Docket Item 32.] See Van Orden v. Borough of Woodstown, No. 13-5002, 2013 WL 6447163, at *1-*2 (D.N.J. Dec. 9, 2013). In an earlier opinion, the Court also considered the claims against Borough of Woodstown and the Woodstown Police Department ("Woodstown Defendants"), and Pilesgrove Township, and dismissed the state tort actions against them, leaving only the § 1983 claim for state created danger. [Docket Item 44.] See Van Orden v. Borough of Woodstown, 5 F. Supp. 3d 676, 679 (D.N.J. 2014).

In a subsequent opinion, the Court granted dismissal of the state law claims against Salem County and the Salem County

Sheriff ("the Salem County Defendants"), but refused to dismiss on sovereign immunity grounds, and further denied summary judgment on the § 1983 claim for state created danger because discovery was not yet complete. [Docket Item 107.] See Van Orden v. Borough of Woodstown, No. 13-5002, 205 WL 8513255, at *1 (D.N.J. Dec. 11, 2015).

On March 31, 2015, the parties filed a stipulation of voluntary dismissal as to Defendant Pilesgrove Township, stating in part that "the parties agree that the dismissal of the Pilesgrove defendants will automatically convert to a dismissal with prejudice at the close of discovery." [Docket Item 71.] Pretrial factual discovery ended in this matter on August 31, 2015 and since no party has moved to reinstate Pilesgrove Township [See Docket Item 99, Amended Scheduling Order] they will be dismissed from this case with prejudice according to the aforementioned stipulation. [Docket Item 71.]

Presently before the Court are two motions for summary judgment on Plaintiff's state-created danger claim brought by the Woodstown Defendants and the Salem County Defendants.

## II.  FACTUAL BACKGROUND

### A. Veterans Memorial Lake Dam

The Veterans Memorial Lake Dam ("the Dam") is located in the Borough of Woodstown in Salem County, New Jersey, and is owned and operated by the Borough of Woodstown. (Vanaman Dep. 37:15-22; Woodstown Ex. 26, 33 "Maps.") While the State has oversight of the Dam through regulations and enforcement of the regulations, the operation of the Dam is solely the responsibility of the Borough of Woodstown. (See Pfeffer Dep. 115:7-12, "As far as operating the Dam, Woodstown had the sole responsibility for that. . . . [W]e did not share that with any other municipality.") Salem County was in charge of coordinating and assisting the municipalities within the County with any needs regarding disaster response. (Pompper Dep. 12:1-13:1.) Part of its role was to act as intermediary between the municipalities and the State of New Jersey Office of Emergency Management. (Id.) Woodstown always consulted with Salem County when making safety decisions regarding the Dam. (Vanaman Dep. 42:22-44:9.)

The Dam has an Emergency Action Plan ("EAP") in place. Under the EAP, Defendants are responsible for identifying and securing areas that are threatened by the Dam. (Pl. SMF ¶ 12.) The Dam's EAP delineates different roles and responsibilities for the municipal, county, and state offices of emergency management ("OEMs") as follows:

4

Municipal OEM Responsibilities:
   1. Warn the public of emergency conditions at the dam.
   2. Implement and direct required evacuations of threatened
      areas.

. . .

County OEM Responsibilities:
   1. Pass warning of emergency conditions at the dam to all
      affected municipalities
   2. Provide assistance to municipalities to help fulfill the
      emergency responsibilities.

NJ State OEM Responsibilities:
   1. Assumption of control and coordination (when appropriate)
      of all emergency actions in accordance with Public Law.
   2. Provision of assistance to the affected municipalities and
      counties (when requested and beyond their capabilities)
   3. Coordination of specialized assistance.

**B.  *Hurricane Irene***

     Hurricane Irene was a large and destructive tropical

hurricane that hit Salem County, New Jersey on August 28, 2011.

In anticipation of the hurricane, an evening briefing was held

on August 25, 2011, two days prior to Irene's expected arrival,

to give county staff and department heads an updated weather

briefing from the National Weather Service and to stress to

municipalities that they should prepare ahead of time for the

storm. (Pompper Dep. 46:2-8, 54:13-24, 61-62; Woodstown Ex. 17,

Salem County Power Point demonstration.) Based on experience

with the damage wrought by a prior hurricane, Hurricane Floyd in

1999, and by another major storm two weeks earlier on August 14,

2011, both the Woodstown and Salem County Defendants knew there

was the potential for severe flooding. (Pfeffer Dep. 102:2-9; 108-13-15.) During the prior storm on August 14, Harry Vanaman, the Emergency Management Coordinator for the Borough of Woodstown, in consultation with Richard Pfeffer, the Mayor of the Borough of Woodstown at the time, and Jeff Pompper, the Salem County Director of Emergency Services, opened the Dam's floodgates in response to rising waters in the Dam. (Vanaman Dep. 63:11-64:1.) Route 40 near Kings Highway was not affected by the opening of the floodgates on August 14, 2011. (Pfeffer Dep. 85:4-85:9.)

With the August 14 storm fresh in Defendants' mind, the main concern with Hurricane Irene was that the ground was still saturated with water from rainstorms occurring throughout the previous two weeks. (Pompper Dep. 70:7-19.) This meant there would likely be more runoff than normal. (Id.) With so much water there were fears that the Dam could overtop, that it could overflow beyond its spillway capacity, leading to erosion and eventual failure of the Dam if not controlled. (Id.) Mr. Pfeffer testified that the main concern when the Dam overtops is for the immediate lake area, right near the Dam, specifically Mill Street. Id.

In deciding how to prepare for the Hurricane and a potential Dam breach, Woodstown had little concern regarding

6

downstream effects, relying on a recent hydrologic and hydraulic analysis of the Dam ("Engineer Analysis"), which indicated that in the case of dam failure during a 100-year storm, there would be no negative impacts to residential homes or major highways 2500 feet or more downstream of the Dam. (Pl. Ex. 19, Remington and Vernick Engineers report, Woodstown/Pilesgrove/000018; Pfeffer Dep. 101:5-11, 107:20-22.) Based on the Engineer Analysis' finding, Defendants did not consider flooding at the Route 40 and Kings Highway intersection because it was around 10,000 feet downstream from the Dam. (Vanaman Dep. 258:5-14.)

Defendants also relied on the Woodstown's EAP "Inundation Maps" that predicted which areas would be affected if the Dam overtopped. (Pl. Ex. 11, "Inundation Map.") The maps did not include any residential or commercial structures or roadways in the "affected" areas, and more to the point, it did not include the intersection of Route 40 and Kings Highway as a predicted area for flooding. (Id; Woodstown Ex. 39, EAP excerpt on Inundation Maps.)

C. *Restricted Travel on Route 40 in Anticipation of Irene*

In anticipation of the storm, Governor Christie issued a state-wide State of Emergency. N.J. Exec. Or. No. 73 (Aug. 25, 2011). The emergency order authorized the State Director of Emergency Management, "through the police agencies under his

control, to determine the control and direction of the flow of vehicular traffic on any State or interstate highway . . . including the right to detour, reroute, or divert any or all traffic . . ." Id. at ¶ 2. The Executive Order further stated in part:

> WHEREAS, this situation may become too large in scope to be handled by the normal county  and municipal operating services in some parts of this State, and this situation may spread to  other parts of the State; and . . .
>
> 9. In accordance with N.J.S.A. App. A:9-40, no municipality, county, or any other agency, or political subdivision of this State shall enact or enforce any order, rule, regulation, ordinance or resolution which will or might in any way conflict with any of the provisions of this Order, or which will in any way interfere with or impede the achievement of the purposes of this Order.

(Woodstown 000033—000037, Executive Order No. 73.)

Salem County also issued a travel ban which prohibited all non-emergency vehicles from traveling on any road in the County after 10:00 p.m. on August 27, 2011. (See Woodstown Ex. 18, Travel Ban; Pompper Dep. 125:6-18.)

**D. *Decision to Open the Floodgates***

On Friday, August 26, 2011, two days before Hurricane Irene hit, the Dam's floodgates were partially opened in order to lower the Dam's water levels on Memorial Lake to prevent the Dam from overtopping. (Vanaman Dep. 47:12-20, 60:1-9; Pompper Dep. 72:2-19, 76:4-20.) This decision was made by Mr. Vanaman, Mr. Pfeffer, and Mr. Pompper, with the intent to control flooding.

8

(Vanaman Dep. 234:12-236:14; Pompper Dep. 72:2-76:20.) In anticipation of the coming heavy rains, the floodgates were fully opened the following day, August 27, 2011, to take pressure off the dam and provide a reservoir for the Hurricane's rains to fill. (Vanaman Dep. 60:1-9, 234:12-236:14, 238:9-242:13.) This decision was made by Mr. Vanaman, Mr. Pompper, and Mr. Pfeffer, who were concerned that if an upstream dam broke, it could threaten the integrity of the Veteran's Dam and potentially cause a total dam failure. (Vanaman Dep. 238:9-242:13; Pfeffer Dep. 80:23-84:11.)

Mr. Pompper, from Salem County, subsequently notified the South Regional Office of Emergency Management that Mr. Vanaman was concerned the Dam might overtop and so he was opening the floodgates. (Pompper Dep. 77:4-78:11.) Woodstown's Director of Public Safety, Chris Simmermon, called the New Jersey State Police to inform them that the Dam's floodgates had been fully opened. (Simmermon Dep. 129:6-17; Woodstown Ex. 10, "Woodstown/Pilesgrove 00042-00045.")

Despite opening the floodgates, the Dam still overtopped around 10:30 p.m. on August 27, 2011 and water flooded over Mill Street, the road that runs over the top of the Dam, triggering an emergency condition under the Emergency Action Plan for the Dam ("EAP"). (Vanaman Dep. 37:6-12, 89:9-13; Pompper Dep. 89:1-

10.) When Mr. Vanaman learned that this had occurred, he ordered the Woodstown police to block off the affected area of Mill Street and notified the New Jersey State Police of the Dam's Conditions, pursuant to the EAP. (Pompper Dep. 88:13-89:10.) When Salem County heard that the Dam had overtopped, Mr. Pompper quickly notified nearby Pilesgrove Township and Dupont Chambers Works, an active chemical plant, but did not take any further action because State police indicated they were taking control since Route 40 near Kings Highway is in the jurisdiction of the State police. (Pompper Dep. 105:23-106:17; 115:1-15.)

Due to the severity of the flooding, at around 9:43 p.m. on August 27, the New Jersey State Police told Salem County that they would close the affected section of Route 40 east of Kings Highway within the next four hours. (See Woodstown Ex. 19, "Phone message from Sergeant Jay Miller of New Jersey State Police;" Pompper Dep. 106:1-17; Vanaman Dep. 197:5-11.) State Police blocked the traffic west of the flooded portion of Route 40, but did not block traffic east of it, where Ms. Sylvestri eventually drove through and drowned. State Police officer Sergeant Jay Miller testified that they had requested barriers to block Route 40, but were denied because the cones and signage would become "projectiles" in the hazardous winds. (Statement of Jay Miller 4:7-18.)

10

In the Borough of Woodstown, almost every road was flooded and bridges were giving out; Woodstown had no control over the water coming from upstream. (Vanaman Dep. 447-450.) The Woodstown Police Department was continuously responding "from one emergency to the next" throughout the storm. (Simmermon Dep. 25.)  Three people were required to evacuate when water flooded their home from a failed dam upstream, the East Lake Dam. (Vanaman Dep. 226.) The Woodstown Police Department was busy pulling people out of flooded cars. (Simmermon Dep. 144:1-10.)

At around 11:00 p.m. on August 27, 2011, Route 40 at Chestnut Run, a tributary which flows into the Salem River downstream of the Dam, overtopped with water and shut down Route 40/45 upstream of the Route 40 and Kings Highway intersection. (Zilinksi Dep. 63:11-65:2; Simmermon Dep. 156:12-157:9, 162:13-163:4; Vanaman Dep. 304:21-305:15. See also, Woodstown Ex. 26, Map REM 0000015.) Woodstown Mayor Mr. Pfeffer testified that when Chestnut Run overtopped because of a blocked pipe it created a lake effect and a subsequent surge of water in the area of Route 40 and Kings Highway. (Pfeffer Dep. 84:22-91:5.)

### E. Ms. Sylvestri's Actions During Hurricane Irene

At around 1:00 a.m. on August 28, 2011, Ms. Sylvestri called the 911 Emergency Center indicating she was trapped in her car on Route 40 at the intersection of Kings Highway with

water up to her neck. (Oliveto Dep 9:20-13:5; Woodstown Ex. 20, "Sworn Statement of Daniel Cumming.") Ms. Sylvestri had been aware of the Salem County travel ban, as well as the State of Emergency, but departed her home around 11 p.m. to visit a friend. (Oliveto Dep. 28:18-29:6.) Detective Cumming who responded on-scene to Ms. Sylvestri's call, reported that "the weather conditions throughout the evening prior to and during the initial part of our response included heavy downpours of rain and strong winds. Visibility was extremely low due to the weather and darkness of night." (Woodstown Ex. 21, Cumming Report.) Mr. Cunning further stated, "upon arrival on scene, the responders [State Police and Fire Department] encountered not only the weather conditions, but what appeared to be flash flooding of US 40." (Id.) At the Route 40 intersection with Kings Highway, the water had swelled above the bridge and was covering around 100 yards of the roadway. (Id.) The depth of the water at the deepest section was around three and a half feet. (Id.)  Mr. Cunning also noted that when he had passed through the area of Route 40 and Kings Highway earlier in the evening he did not witness any flooding at that time. (Woodstown Ex. 20, Sworn Statement of Daniel Cumming.) Due to the storm conditions, emergency responders' attempts to rescue Ms. Sylvestri failed and she eventually drowned.

12

### F. *Hurricane Floyd and Subsequent Amendments to the EAP*

The last time the Dam overtopped was during Hurricane Floyd in 1999. (Executive Director for Lower Township Municipal Utilities Authority, Carl DeMercantonio Dep. 79:1-10.) During that storm, the Dam's floodgates were opened several days prior to the storm. (Id.)  The goal was to reduce the water levels as much as possible so that the rain had somewhere to go. Despite their efforts, the Dam still overtopped. (Id.)

After Hurricane Floyd, the Borough of Woodstown began repairs on Veterans Memorial Lake. (See Pl. Ex. 7, Woodstown/Pilesgrove 000563.) Since the Dam was classified as a "Significant Hazard Dam" at that time, Woodstown was required to conduct regular safety inspections and provide reports to the New Jersey Department of Environmental Protection's Bureau of Dam Safety ("The Department"). (N.J.S.A 58:4-1 et. seq; N.J.A.C. 7:20-1.11(c).) Woodstown received a letter in January, 2001 from the Department indicating that because of the Dam construction, the EAP from 1999 needed to be revised to include a dam breach analysis and inundation mapping. (Pl. Ex. 7, Woodstown/Pilesgrove 000563.) After Woodstown submitted a revised EAP, a subsequent letter from Dam Safety indicated that the "text portion of the EAP is acceptable as revised [but] . .

13

. mapping provided is incomplete." (Id, Woodstown/Pilesgrove 001760.)

The record shows that Woodstown was again contacted repeatedly in February, March, July, and August 2007 because of an overdue dam safety inspection report, which required Woodstown to conduct a "visual dam safety inspection and submit a detailed report on the findings." (Id, Woodstown/Pilesgrove 000355, 000353, 000351, 000350.) The record does not indicate whether a visual inspection report was ever submitted prior to August 2011, but Mr. Vanaman testified that he reviewed and updated the Borough's overall Emergency Operations Plan in March 2011. (Vanaman Dep. 479:8-17.) Mr. Vanaman also testified that he conducted two training sessions prior to Hurricane Irene, instructing employees on opening the floodgates and how to identify a Dam emergency condition under the EAP. (Vanaman Dep. 479:18-21.)

In July, 2011 Woodstown conducted an Engineer Analysis, with "the intent to gather all existing information for the dam, including previous studies that had been performed for areas upstream and downstream of the site." (Woodstown Ex. 16, "R & V Report," Woodstown/Pilesgrove 000018.) The information from the studies was then used to develop models to determine potential flooding impacts on downstream properties during both a 24-hour

14

and 100-year storm. (Id.) The results for both storm scenarios indicated "that there will be not be any impacts to residential homes below the dam." (Id.) The Analysis also recommended the Dam be reclassified from a Class II, "significant hazard" dam to a Class III, "low hazard" dam. (Id; Pl. Ex. 19, "Hydrologic and Hydraulic Analysis.") Prior to Hurricane Irene, on August 9, 2011 the engineer who conducted the analysis sent an email to Woodstown informing them that John Ritchey, from the Department of Environmental Protection, preliminarily approved the reclassification of the Dam to Class III. (Woodstown Ex. 14, "Woodstown/Pilesgrove 000460.) The Dam was formally reclassified as a class III dam a year later on August 22, 2012, removing the requirement that Woodstown maintain an EAP for the Dam. (Woodstown Ex. 15, Woodstown/Pilesgrove 000468, "Final Approval letter;" Dalessio Dep. 143:9-144:5.)

## III. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, and thus at the summary judgment stage credibility issues should be resolved against the moving party. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, "[t]he mere existence of a scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate "[w]here the record . . . could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.  § 1983 STATE-CREATED DANGER LEGAL STANDARD

The threshold question in any § 1983 lawsuit is whether the plaintiff has sufficiently alleged a deprivation of a constitutional right. Plaintiff's claim invokes the substantive component of the Due Process Clause of the Fourteenth Amendment, which "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (internal quotation marks omitted). As a general rule, the failure of the state to protect a person against private harm does not amount to a violation of the Due Process Clause. See Martinez v. California, 444 U.S. 227, 284-85 (1980). In DeShaney v. Winnebago Cty. Dept. of Social Services, 490 U.S. 189 (1989), the Supreme Court explained that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, property of its citizens against invasion by private actors." Id. at 195. Applying this principle, the Court held that state social workers did not deprive four-year-old Joshua DeShaney of substantive due process when they failed to remove him from a physically abusive household, despite their ongoing knowledge of suspected abuse by his father. Id. at 201-02. The Court held that, "[a]s a general matter . . . a State's failure to protect an individual against

private violence simply does not constitute a violation of the Due Process Clause." Id. at 107; see also Bennett, ex rel. Irvine v. City of Philadelphia, 499 F.3d 281, 289, 290 (3d Cir. 2007) ("If a municipality, state or other public body is to be liable under the Constitution for harm caused by private parties to persons not in custody, the liability would be unlimited. There is no legal doctrine that supports imposition of such liability . . . . It is not the role of the courts, certainly not the federal courts, to rectify failures . . . .")

However, the DeShaney Court suggested that there may have been a different result if the State played an active role in creating or enhancing the danger to which Joshua was exposed. See id. at 201 ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.") Using this principle, the Third Circuit, along with other circuits, has concluded that liability under § 1983 can be established when the state affirmatively puts a person in a position of danger that the person would not otherwise have been in, known as a "state-created danger." For instance, in Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1997), the court found the state had created a danger, for § 1983 purposes when police officers stopped an obviously intoxicated pedestrian

walking home from a bar but then left her to go home alone in cold weather; the woman subsequently fell down an embankment and suffered brain damage. The Kneipp court held that such facts established a violation of the plaintiff's Fourteenth Amendment substantive due process right and liberty interest in personal security. Id.

In Bright v. Westmoreland Cty., 443 F.3d 276 (3d Cir. 2006), the Third Circuit laid out the elements a plaintiff must show in order to successfully plead a state-created danger claim:

1. The harm ultimately caused was foreseeable and fairly direct;

2. A state actor acted with a degree of culpability that shocks the conscience;

3. A relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions; and

4. A state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.
Id. at 281.

## V.   DISCUSSION

Plaintiff has suffered a grievous tragedy no mother should have to bear. However, even giving all reasonable inferences to Plaintiff, the facts as alleged do not indicate that this

tragedy was the result of a state-created danger. For the reasons set forth below, this Court holds that Plaintiff has not raised a genuine issue of material fact to counter either Salem County or Woodstown Defendants' Motions for Summary Judgment. Based on the factual record as put forth, no reasonable fact-finder could find that Defendants had acted in a manner that satisfied all four elements of a state-created danger test. Therefore, Plaintiff has not alleged a cognizable claim under § 1983.

### A. Opening the Floodgates

The decision to open the floodgates does not amount to a state-created danger because no reasonable juror could find that Defendant's actions shocked the conscience.

Plaintiff alleges in her Complaint that the decision to open the floodgates without closing Route 40 or providing law enforcement where Ms. Sylvestri was swept away was wrongful and conscious shocking (Cl. ¶ 6). Defendants Woodstown and Salem County argue that there is nothing in the record to establish that the decision to open the floodgates was a wrongful decision, let alone a conscience-shocking one. (Woodstown MSJ at 10; Salem County MSJ at 11.) The Court finds Plaintiff fails to raise a genuine issue over whether the Salem County or Woodstown

20

Defendants consciously disregarded a great risk of serious harm by deciding to open the floodgates during Hurricane Irene.

The Supreme Court has emphasized that the "touchstone of due process" is protection against arbitrary government action. Cty. of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (internal quotation marks omitted). Government action is "arbitrary in the constitutional sense," id. at 846 (quoting Collins, 503 U.S. at 129), when it is "so egregious [and] so outrageous, that it may fairly be said to shock the conscience." Id. at 847 n.8; see also United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399-400 (3d Cir. 2003) ("[O]ur cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience.").

The measure of what actions count as conscience shocking is "no calibrated yard stick," and is a highly fact-specific inquiry. Kaucher v. Cty. of Bucks, 455 F.3d 418, 425 (quoting Lewis, 523 U.S. at 847). Thus, "[actions] that shock in one environment may not be so patently egregious in another." Id. But it is well established that negligent behavior can never rise to the level of conscience shocking behavior. See Lewis, 523 U.S. at 849 ([L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). On the other hand, there is no requirement that an

21

actor actually know his or her actions are "conscience-shocking." Phillips v. Cty. of Allegheny, 515 F.3d 224, 242 (3d Cir. 2008). It is those actions that are "*intended* to injure in some way unjustifiable by any governmental interest" that are "most likely to rise to the conscience-shocking level." Id. (emphasis added). Acts that fall between these extremes of mere negligence and harmful intent require courts to make "closer calls," based on a context-specific inquiry. Kaucher, 455 F.3d at 426 (quoting Lewis, 523 U.S. at 849); Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999). See also, Estate of Smith v. Marasco (Smith I), 318 F.3d 497, 508 (3d Cir. 2003) ("[O]ur cases have repeatedly acknowledged . . . that the meaning of [the shocks-the-conscience] standard varies depending on the factual context.").

Three possible standards of culpability can be used to determine whether state action shocks the conscience: (1) intent to cause harm; (2) deliberate indifference; or (3) gross negligence or arbitrariness that indeed shocks the conscience. Sanford v. Stiles, 456 F.3d 298, 306 (3d Cir. 2006). The level of culpability that is required to shock the conscience increases as the time state actors have to deliberate decreases. Sanford, 456 F.3d at 309. Plaintiff and Defendants disagree over which level of culpability should apply; Plaintiffs argue for

22

"deliberate indifference," Defendants for "gross negligence and arbitrariness." Because this Court holds no reasonable juror could find that Defendants' conduct was deliberately indifferent, it need not reach the question of whether a higher standard of culpability would be necessary to shock the conscience here.

In the context of municipal liability, as is the case at hand, the Supreme Court has defined deliberate indifference as a more "stringent standard of fault, requiring proof that a municipal actor disregarded a *known* or *obvious* consequence of his action." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (emphasis added). While the Third Circuit does not require "actual knowledge" to satisfy the deliberate indifference standard, see Phillips v. Cty. of Allegheny, 515 F.3d at 242, the state actor's conduct "must evince a willingness to ignore a foreseeable danger or risk." For instance, in Kaucher, 455 F.3d 418, the court found that a correctional facility's alleged failure to take adequate remedial and preventative measures to stop the spread of MRSA within the facility did not rise to a level of deliberate indifference that could be characterized as conscience shocking. Id. at 27. The court found there was no evidence that the defendants were either aware or recklessly unaware that their

remedial and preventative measures were inadequate to protect their employees from infections. Id. at 28. The court noted the following details in support of its decision: the jail was in compliance with state standards, giving defendants reason to believe the measures were adequate; only two of 170 corrections officers tested positive for the infection; and the facility had in place policies and procedures to ensure sanitary conditions in the jail. Id. at 427. Thus, the court concluded that the state actors believed their measures were adequate to protect from infections, and thus did not "evince a willingness to ignore a foreseeable danger." Id; Phillips, 515 F.3d at 242.

Similarly, in Schieber v. City of Philadelphia, 320 F.3d 409, 422 (3d Cir. 2003) the court held that police officers were not deliberately indifferent to a murder victim's due process rights for failure to enter a victim's apartment in response to a 911 call when the victim was still alive. In comparing other state-created danger cases within the circuit, the court determined that liability could only exist if the officers "*subjectively* appreciated and consciously ignored a great, i.e., more than substantial, risk that the failure to break down [the victim's] door would result in significant harm to her." Id. at 423 (emphasis added).

24

A Plaintiff can get around the subjective requirement of the deliberate indifference standard if the risk of harm is clearly obvious. See Phillips, 515 F.3d at 240–41 (citing Sanford, 456 F.3d at 308, and explaining that deliberate indifference may exist "without actual knowledge of a risk of harm when the risk is so obvious that it should be known"). See also, D.N. ex rel. Nelson v. Snyder, 608 F. Supp. 2d 615, 626 (M.D.Pa. 2006) (finding that a Township's chief of police and city manager should have known the potential for future harm when they concealed a subordinate police officer's use of a department computer to view child pornography. "The risk (not to mention the impropriety) of concealing such illegality was so obvious that . . . [such action] is sufficient to meet the 'shock the conscience' standard.")

In the present case, there is nothing in the record to show that opening the floodgates posed such an "obvious" risk of harm to drivers like Ms. Sylvestri at the Route 40 and Kings Highway intersection. Nor does the evidence create any question as to whether Defendants were consciously aware of such a risk and chose to ignore it. No reasonable jury could find that either the Woodstown or Salem County Defendants were actively aware, or recklessly unaware, of the threat to drivers on Route 40 near Kings Highway upon opening their floodgates because: (1) opening

the Dam's floodgates was a necessary procedure to prevent the
Dam from overtopping; (2) the recent Engineer Analysis
classified the Dam as low hazard, meaning it did not predict any
disaster effects, and indicated a dam failure would not impact
residential highways such as Route 40; (3) the Inundation Map
predicting what areas would flood if the Dam overtopped did not
include Route 40 and Kings Highway; and (4) there was a county-
wide travel ban and a State of Emergency in place that prevented
drivers like Ms. Sylvestri from driving on the roads. Thus, Ms.
Sylvestri's death regrettably was not a "known or obvious
consequence" to opening the floodgates. See Bd. of County
Comm'rs, 520 U.S. at 410.

First, and quite significantly, opening the floodgates was
a necessary protocol for relieving pressure from the Dam in
order to prevent overtopping or full dam failure. (Vanaman Dep.
238:15-16.) The Woodstown and Salem County emergency actors were
concerned about the Dam being able to withstand the pressure if
another dam upstream broke during the Hurricane, so they took
the only possible precaution in opening the floodgates. (Vanaman
Dep. 238:9-242:14; Pfeffer Dep. 80:23-84:11.) Opening the
floodgates created a reservoir so that the lake could absorb
extra water from the anticipated hurricane and potential dam
breaches from other dams. (Vanaman Dep. 234:12-236:14.) In a

storm just two weeks prior on August 14, 2011, the Defendants
had opened the floodgates to relieve pressure on the Dam and
experienced no flooding near Route 40. (Vanaman Dep. 245.) After
that storm, the Defendants held an informal critique discussing
how everything went when opening the Dam and whether any
improvements needed to be made. Id. No improvements were deemed
necessary. Id. With regards to Hurricane Irene, Mr. Vanaman, Mr.
Pfeffer, and Mr. Pompper collectively made the decision to open
the floodgates of the Dam, and each testified that they had no
knowledge that opening the floodgates would cause Route 40 near
King's Highway to flood. (Pffefer Dep. 108:13-15; Pompper 62:12-
13, 110:1-10; Vanaman Dep. 47-48.).

Second, Defendants relied on a professional engineer
analysis to determine that opening the floodgate was a safe
measure that would not affect any residential areas or roadways
such as Route 40. The Engineer Analysis by Remington and
Vernick, which Woodstown received August 10, 2011, stated that
in the event of a 100-year or 24 hour storm *with dam failure*
there was no danger of "negative impacts to residential homes,
major highways or railroads." (Woodstown Ex. 16, R & V report –
Woodstown/Pilesgrove/000018.) Just as the court in Kaucher, 455
F.3d at 427, found that the defendant jail's compliance with
state standards gave it reason to believe that its measures were

27

adequate, in the instant case the Hydrologic and Hydraulic analysis (the "Engineer Analysis") of the Dam, which put Defendants in compliance with the Dam Safety Act, gave Defendants reason to believe that opening the floodgates during Hurricane Irene was an adequate measure. The report additionally recommended that the Dam be downgraded from a Class II (Significant Hazard Potential) to a Class III dam (Low Hazard Potential) based upon there being no contemplated disaster effects from a dam breach. (Id.)

Based on these reports, the Defendants did not expect the effects of opening the floodgates to be something they could not control, or to extend to roadways such as the intersection of Route 40 and Kings Highway. The Analysis examined the effects of total dam failure, which releases significantly more water than simply opening the floodgates. It was conducted by reputable engineers just a few weeks prior to Hurricane Irene. For Defendants to assume that there would be no significant harm to Route 40 and Kings Highway intersection based upon this report, even if Plaintiffs were able to prove correlation between opening the floodgates and the severity of the flooding at Route 40, does not arise to the level of deliberate indifference. In opening the floodgates, Defendants were simply not aware, nor

recklessly unaware, of any risk for them to deliberately disregard.

Further, Defendants relied on the EAP for the Dam to infer that the area near Route 40 and Kings Highway would not be affected by flooding in the event of the Dam overtopping. The inundation map for the Dam, which predicts areas to be affected by the Dam overtopping, did not include Ms. Sylvestri's location in the anticipated flood-zones. (Woodstown Ex. 28, Inundation Map.) Under the section titled, "Description of Inundated Area," the EAP for the Dam stated, "Undeveloped Salem River Flood Plain. No residential or commercial structures or *roadways* are within the inundation area." (Woodstown Ex. 39, "Description of Inundated Areas") (emphasis added).

Finally, for several hours preceding and including the time of Ms. Sylvestri's drive through the severe storm, there was a County-wide travel ban in place (Woodstown Ex. 18 "Travel Ban"), along with Governor Christie's State of Emergency (Executive Order No. 73), which gave Defendants reason to believe no one would be on the roads, especially in rural areas such as Route 40 and Kings Highway. This further reinforces the idea that neither the Woodstown nor Salem County Defendants "subjectively appreciated and consciously ignored" a risk of serious harm to

drivers at Route 40 by opening the floodgates. <u>See</u> <u>Scheiber</u>, 320 F.3d at 423.

Vanaman, Pfeffer, and Pompper were certainly aware of the risks associated with opening the floodgates, for which they took adequate safety precautions and emergency measures, mainly in preparation for the flooding of Mill Street. There is no evidence from which a reasonable jury could conclude that any of these individuals were aware that the risks of opening the floodgates could affect as far downstream as Route 40 and Kings Highway; thus, such a result from opening the Dam's floodgates was not a risk for them to "subjectively appreciate and consciously ignore." <u>See</u> <u>Schieber</u>, 320 F.3d at 423. By opening the floodgates Defendants were not disregarding any known risks, but appropriately contemplating the greater danger if the Dam overtopped and breached. This is the opposite of deliberate indifference to a known risk of life-threatening flooding on Route 40. The Court is thus compelled to conclude the evidence is insufficient to permit a jury to find Defendants recognized and *deliberately disregarded* the substantial risk of serious harm to a person in a similar position as Ms. Sylevstri. Plaintiff cannot show, nor does the record establish, that Defendants' action in opening the floodgate shocks the conscience.

30

Plaintiff must allege facts demonstrating that she can reasonably meet *each* of the four <u>Bright</u> factors to establish a state-created danger. Plaintiff has failed to allege facts to meet the second prong, conscience-shocking behavior, and so our analysis can end there. Summary Judgment will be granted in favor of both the Salem and Woodstown Defendants on this state-created danger theory. Because this is Plaintiff's only allegation against the Salem County Defendants, those parties are hereby dismissed from this case. Plaintiff asserts an additional theory of liability under a state-created danger claim against the Woodstown Defendants for failing to maintain an adequate Emergency Action Plan for the Dam, which is analyzed in the subsequent section.

**B. Woodstown's Failure to Adequately update the EAP**

Plaintiff alleges that the Woodstown Defendants violated her substantive due process rights by failing to maintain an updated EAP. In granting summary judgment to Woodstown on this claim, the Court need not look further than the first element of the state-created danger claim. The record does not raise a genuine question as to whether the harm was a "fairly direct" result of Woodstown's actions in not maintaining an updated EAP. Thus Plaintiff has not adequately pled a state-created danger

claim and summary judgment will be granted in favor of the Woodstown Defendants.

State actors are not liable every time their actions could potentially set into motion a chain of events that result in harm. The Supreme Court has explained for instance, that "[a] legislative decision that has an incremental impact on the probability that death will result in any given situation – such as setting the speed limit at 55-miles-per-hour instead of 45 – cannot be characterized as state action depriving a person of life just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander." Martinez v. State of Cal., 444 U.S. 277, 281 (1980).

The crux of Plaintiff's argument is exactly the kind the Court in Martinez prohibited. Plaintiff alleges that had the Borough of Woodstown updated the EAP following Hurricane Floyd, then it would have known that opening the floodgates could cause flooding to the area of Route 40 where Ms. Sylvestri drowned, and as such prevented the timely closure of the road. (Pl. Supplemental SMF ¶ 82-90; Pl. Opp. to Salem SMF, ¶ 1.)  But the Court finds this is too attenuated a claim to convince a jury that the failure to update the EAP was a "fairly *direct*" cause of Ms. Sylvestri's tragic death. Bright, 443 F.3d at 281 (emphasis added). In Morse v. Lower Merion Sch. Dist., 132 F.3d

32

902, 908 (3d Cir. 1997), the court held that school officials permitting construction workers to leave the school's rear entrance unlocked was not the "fairly direct" cause of a fatal shooting of a teacher by a trespasser. The court found that even in spite of "previous security breaches by unnamed persons" and knowledge that the assailant had been loitering in the school area the week before the shooting, this was not enough to warn officials that the person would enter the school in search of this victim. Id.  The school's actions, the court concluded, were not the "catalyst for the attack" on the teacher because "[t]he causation, if any, [was] too attenuated." Id. at 909-10; cf L.R. Sch. Dist. of Philadelphia, No. 14-4640, 2016 WL 4608133, at *5 (3d Cir. September 6, 2016) (finding that it was foreseeable that a teacher releasing a five-year-old student in her custody to a stranger could result in harm to the child based on experience as a teacher and basic common sense).

Here too, there are too many attenuated variables to find that Woodstown's failure to update the EAP was the "catalyst" for Ms. Sylvestri's death. Even if Plaintiff could show that opening the floodgates did indeed cause the flooding at the Route 40 intersection, which the experts on each side dispute, there is nothing in the record to support a juror finding that changes in the EAP would have created a different outcome. There

33

is no evidence of causation because: (1) the Woodstown Defendants did not have the jurisdiction to close the area of Route 40 where Ms. Sylvestri drowned; (2) if Defendants did not open the floodgates, the Dam would have overtopped causing greater flooding; (3) Defendants had to weigh many competing factors in deciding how to allocate limited emergency resources; and (4) the potential effects from the failure to update the EAP after Hurricane Floyd were cured prior to Hurricane Irene.

It is undisputed that the Woodstown Defendants did not have the authority to close the road themselves. The area of Route 40 where Ms. Sylvestri drowned was not located within the Borough of Woodstown, (See Pl. Ex. 11 "Inundation Map;" Woodstown Ex. 26 Map; Woodstown Ex. 33 Map) and Route 40 is a State highway under the jurisdiction of the New Jersey State Police. (Woodstown SMF ¶ 85; Pompper Dep. 105:23-106:17; 115:1-115:15.)

Since the State police during Hurricane Irene knew that Route 40 was flooded, any updates to the EAP to include the fact that the area had flooded during Hurricane Floyd would not have made a difference. After the floodgates had been opened, the State police knew that Route 40 was affected and took what they believed to be appropriate measures. At 9:43 p.m. on August 27, 2011, Sergeant Miller reported that the State police would close the Route 40 Bridge east of Kings Highway "within the next four

34

hours." (Woodstown Ex. 19, "Phone Message from Sergeant Jay
Miller of New Jersey State Police.") Sergeant Miller testified
that even if the police had known earlier that flooding would
occur in that area, they would have had no way to block the
highway. (Statement of Jay Miller 6:5-8.) New Jersey State
Police Detective Daniel Cunning noted in his report that, "the
weather conditions throughout the evening prior to and during
the initial part of our response included heavy downpours of
rain and strong winds. Visibility was extremely low due to the
weather and darkness of the night." (Woodstown Ex. 21, "Cunning
Report.") The State police had even requested barriers to close
the road, but were denied because the high winds would turn the
cones and signage into dangerous projectiles. (Id. at 4:7-18.)
Thus, the State police, along with Woodstown and Salem, relied
on Salem County's travel ban issued on August 27, 2011
(Woodstown Ex. 18 "Travel Ban") and Governor Christie's state of
emergency issued on August 25, 2011 (Executive Order No. 73) to
keep drivers off the roads. (Pompper Dep. 125:6-125:18;
Woodstown Ex. 18, "Travel Ban.") Any updates to the EAP
regarding Route 40's potential flooding would not have changed
the State Police's actions.

    Further, even if Woodstown had jurisdiction to close the
road (which they undisputedly did not), its decision as to how

to allocate its resources during an emergency requires careful policy determinations. The Woodstown Defendants had a "host of policy choices" to make, both before and during Hurricane Irene. See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 129 (1992) (declining to find a state-created danger liability when a city sanitation department employee died of asphyxia despite the defendant city knowing of the existence of noxious gases in the sewer system because such a decision as to warn or train its employees about such hazards is part of a "host of policy choices that must be made by locally elected representatives, rather than by federal judges.") The decision to update an Emergency Plan and what criteria to look for in declaring an emergency requires careful consideration of many competing factors. Given the myriad of considerations, there is no evidence that Woodstown would have even had the ability to provide emergency coverage to that area.

The flooding of Route 40 near Kings Highway was by no means the only dangerous situation near the Borough or County at the time. (See Pfeffer Dep. 152:6-3 (estimating at least fifty other similar opportunities for a disaster to occur in the county at the same time."); Simmermon Dep. 25 (explaining how the Woodstown police were continuously responding from one emergency to the next); Statement of Jay Miller 3:20-21 ("[Woodstown] was

36

just answering calls for service and doing the best they could
to address everything that happened during the emergency.")
Woodstown acknowledges that resources were limited and that
there was no way they could provide emergency coverage for every
situation. (See Pfeffer Dep. 151-52 ("How can we in the midst of
this horrible storm, with flooding everywhere, evaluate one
instance of flooding and say [ ] we're going to lose a life
there, we better block it off. How do we make that decision
based on every other road that's flooded and washed out?")).
They relied on the travel ban to keep people off the roads, and
the Woodstown Borough put up tape, cones, and barricades to keep
everyone out of known flooded areas in the Borough. (Vanaman Dep
141:1-7; 147:1-14.) Woodstown further established the firehouse
as a reception center for evacuated persons (Vanaman Dep.
157:11-24) and helped evacuate three people whose homes were
flooded with water from a failed dam upstream. (Vanaman Dep.
226.) Woodstown Police were patrolling continuously, looking for
flooded roadways, anyone in distress and other hazards created
by the storm. (Zilinski Dep. 24:13-18.) After the State
Emergency was issued, Detective Zilinski testified that there
was almost zero traffic on the roads. (Zilinski Dep. 113:1-14.)
Given the many emergencies, even if Woodstown had updated the
EAP to put all parties on notice that flooding might occur at

the Route 40 and Kings Highway intersection, Plaintiff cannot show that Woodstown would have even had the resources available to accommodate that area.

Finally, while there may not have been an immediate update to the EAP following Hurricane Floyd, this was eventually cured and did not cause any lasting inadequacies in the EAP. The Emergency Operation Plan ("EOP") for the Borough of Woodstown was updated prior to Hurricane Irene. Mr. Vanaman as the Emergency Management Coordinator for the Borough, testified that he reviewed and updated the EOP in March 2011. (Vanaman Dep. 479:8-17.) Mr. Vanaman did not choose to update the Emergency Action Plan for Veterans Memorial Lake, because "if something in this document did not need to be updated, it stayed the same as it was before." (Vanaman Dep. 479:18-21.) Mr. Vanaman also conducted at least two training sessions prior to August 2011, training employees on opening the floodgates and determining if a dam was in an advisory, warning, or emergency condition. (Vanaman Dep. 167:12-24; 221:16-223:27.) Additionally, the Engineer Analysis, which predicted no impact to residential roadways, was conducted prior to Hurricane Irene and satisfied the requirement that Woodstown conduct a "visual dam safety inspection" pursuant to N.J.A.C. 7:20-1.11(c).

38

The Court thus finds no reasonable juror could determine that updating the EAP prior to Hurricane Irene would have had any material impact on Woodstown's actions. Plaintiff can therefore not establish that the Woodstown Defendants' actions were the "catalyst" for Ms. Sylvestri's death, and her state-created danger claim will fail. Summary Judgment will further be granted in favor of the Woodstown Defendants on this claim and those parties are dismissed.

## VI.  CONCLUSION

The Supreme Court has counseled a restrained approach in the area of substantive due process. Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). Heeding this advice, the DeShaney Court declined to expand its substantive due process jurisprudence even in the face of tragic circumstances, explaining that:

[t]he people ... may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

489 U.S. at 203.

Again, in Cty. of Sacramento v. Lewis, the Court said that the Constitution cannot "impos[e] liability whenever someone

39

cloaked with state authority causes harm," 523 U.S. 833, 848 (1998), emphasizing that the courts should hold responsible "only the most egregious official conduct." Id. at 846.

Under our state-created danger jurisprudence, this Court cannot find that the Woodstown or Salem County Defendants' decision to open the flood gates, or the Woodstown Defendants' alleged failure to update the EAP, amounts to a state-created danger. For the foregoing reasons, the respective Summary Judgment Motions for the Salem County and Woodstown Defendants are granted. Plaintiff's state-created danger claim is hereby dismissed. An appropriate Order follows.

**November 10, 2016**                          **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                     Chief U.S. District Judge